Good morning, may it please the Court, my name is Caroline Fowler, City Attorney representing the appellants in this case, Sgt. Rich Selle, Officers Patricia Mann, Travis Mink, and the City of Santa Rosa. I would like to reserve five minutes of my time for purposes of rebuttal. You may do so, Counsel, just watch the clock. Thank you. The standard that the District Court applied in this case in reviewing the Defendant's Summary Judgment Motion is contrary to existing law and would seriously jeopardize the lives of police officers if this Court were to uphold that standard. In this case, the officers responded to a call of shots fired in a residence where minors were present and, while en route, received additional information that additional shots had been fired. Within less than two minutes after arriving on the scene, the suspect, without any provocation or warning, suddenly charged at the officers who had their weapons drawn and pointed at the suspect. No, no, no. Let's use the proper standard in the trial court as to factual matters. I note here in the case, was your motion for summary judgment the non-movement, the plaintiff in this case, is entitled to a favorable view of the evidence which she presented, right? That's correct, Your Honor. Now, the deposition of Mrs. DeSantis established that, not that he was running toward them, but that he walked toward them, was told to kneel down. He kneeled down after being told several times. There were six officers on the scene. He got down, he got back up, and there's some testimony that she doesn't know whether he was running or walking after he got back up. He was shot in the arm with a non-bullet projectile, which shattered his arm. And at that point, she testified that he started running. So there was walk, kneel, walk, run, if you believe her, right? I don't believe that, actually. What's wrong with my recitation? At one point, she did say that he was walking. If you look at her testimony in its totality, she said that in her mind everything moved in slow motion and that she could not judge the speed at which Mr. DeSantis I don't think she differentiated between these times. And what she said, Your Honor, was that he was running at the police officers and she believed was intending to headbutt the officers. And that's at page 907 of the excerpts of records. I don't know why he was going towards them. I mean, he didn't have anything on him unless he was going to headbutt them. I don't know. But did it look to you, answer, it looked like he was running if there was the position he had. That's after he's already kneeled and he got up, right? Yes. And after he's been hit by a projectile, right? No. It's not clear that her testimony is after he's been hit by the projectile. And I would also submit that it's not a genuine dispute of fact. You have seven witnesses who all dispute Mrs. DeSantis' testimony. And by her own admission, everything in her mind was in slow motion, not just one portion of this event, but the entire event. And therefore, her testimony is given very little weight. The Court should not, when there is overwhelming evidence in the record, adopt a version of the facts that cannot be found to be reasonable by a trier of fact. Not only do you have six witnesses. But this trier of fact found it to be reasonable. And that's why we believe the Court erred. We don't think it was reasonable. Right. But that's a different standard. It's clear error, then. I mean, you said that we shouldn't accept it if no reasonable trier of fact could accept it. But clearly, at least one judge accepted her version in denying qualified immunity. So that argument doesn't help you very much, does it? The standard for this Court is to review the matter de novo. And we believe that the evidence, when the totality of Mrs. DeSantis' testimony is looked at, supports the material facts that Mr. DeSantis unexpectedly, without provocation, charged at the officers. We don't review findings of fact that were made by the district court. Basically, what we do is take the facts in the light most favorable to the plaintiff and see whether or not there was a – when we are reviewing qualified immunity, whether or not a constitutional violation occurred. Isn't that what we do? That's correct, Your Honor. But I believe it's the Court's responsibility to review the testimony in its totality. And when Mrs. DeSantis' testimony is reviewed in its totality, it shows that it is consistent with the testimony of all other witnesses. This is not a typical case like many cases involving deadly force where the only witnesses are the involved officers. Here, there are three officers that are not defendants. There is also an independent eyewitness who is the neighbor of Mr. DeSantis who testified that when Mr. DeSantis ran at the officers, it appeared to him that he was committing suicide. Counsel, you say we have the NOVO standard. What is the principal authority that you're relying on with respect to the qualified immunity issue? Graham v. Conner, that line, or any other? Graham v. Conner, Scott v. Henrich. I think the one of the main decisions Which is the closest one that you could cite to us that would be supportive of your interpretation? I think there's not just one. I would say Scott v. Henrich and also the Porter v. Osborne case with respect to the 14th Amendment standard. In the Porter v. Osborne case, the Court said that the standard under the 14th Amendment requires that the officers have to have a purpose to harm without any legitimate law enforcement intent. In that case, the situation transpired over five minutes, which is more than twice the time that this incident took place. And the Court found that that was insufficient time for the officers to form the requisite intent to harm the suspect that's necessary for a 14th Amendment case. But, Counsel, even in Scott, we said that all we have to first resolve all factual disputes in favor of the plaintiff. That's correct. However, there is case authority that said it has to be a genuine dispute of a material fact and that the Court should not consider a version of the facts that could not be found to be reasonable. Right. Our position in this case, if you look at Mrs. DeSantis' entire testimony, it's very clear that she does acknowledge that Mr. DeSantis ran at the officers. All right. Let's suppose that that's true, that he ran at the officers. There's six officers with weapons other than bullets. They've got a gun, I can't remember, a sage gun and a taser gun and a dog, right? That's correct, Your Honor. And billy clubs, right? Yes. There were three of them. And they're all informed that he was mentally ill. They were advised of that. What they were responding to was the situation in which shots were fired. But they were advised that he was mentally ill, that he was off his rocker, right? On the dispatch. They had an unsubstantiated report by his wife, yes. Right. So that's something to look out for. They're on notice, right? It's a factor that the Court should consider, but it is not the controlling factor. Do you think that no reasonable juror could find that there was any way to stop him from running with six policemen, a dog, billy clubs, tasers and sage gun, other than shoot the man dead? Not in the way that this situation evolved. It was transpired in less than two minutes. As the Court in Scott v. Hendricks said, it would require an excessive amount of superhuman judgment for a police officer to have to evaluate that list of force options in that brief period of time. The Court also ignored the testimony of defendants, expert witness and the officers as to why those other force options were not available under these circumstances. Additionally, when the officers were staged at the scene, there were three officers on each side of the driveway that led down to the DeSantis residence. Couldn't they just back up? He was charging at them. They believed that he had a gun. They had reason to believe he had a gun. Whoa, whoa, whoa. He had socks and Levi's on, no shirt. No shirt. Nothing around his waistband, and I think all the officers said we saw no gun on him. Right? And the Court in Fort has said it's not necessary for an officer to have seen a gun. The reported gun was a Glock, which is a small pistol that he could have concealed in his hand. And the wife had said the gun's inside the house. The wife states that she said that. Six witnesses and the eyewitness said she didn't. She also stated that she reported 9-1-1. Well, but we have to – we have to – on a motion of summary judgment, we have to give her credence, right? Again, it is a genuine dispute. Our position is that it does not create a – What's not genuine about her testimony? Wouldn't the trier of fact be reasonable in believing her that she said the gun's inside the house, he doesn't have a gun? Well, I think the Court has to judge it from the perspective of the officers, and the officers who fired said they did not hear her say that he had a weapon. What case says we have to judge it from the perspective of the officers? I thought we were supposed to take the testimony, excuse me, the light most favorable to the plaintiff. What case says that? When analyzing the conduct of the officers, the Court must look at what the perception of the officer is on the scene. I'm not saying that – What case says that? Graham v. Conner. That the Court, when analyzing the conduct of an officer, cannot engage in 20-20 hindsight and must base it on the perception of the officer at the time.  But on the question of whether he was armed, that's a factual dispute. Did he have a gun? Did he not have a gun? The officers all say, we all thought he had a gun. That's right. She said, I told you, she testified, the wife, I told them that the gun was in the house. You have five officers, six officers saying one thing. You have another witness saying something else. On motion for summary judgment, on the issue, did he have a gun, we have to go with the wife, don't we? No. Why? Well, I think even if you believe the wife's testimony, which is not to be answered by a 911 call. No, you don't have to believe or disbelieve on motion for summary judgment. You have to give all intendance in favor of her deposition testimony. That's correct, Your Honor. And even if you give credence to that testimony, the officers are not required to risk their lives on her statement when they had not had a gun. The issue is, is he armed? Is he not armed? They had not had a gun. You can disbelieve all the officers if you believe her. The officers acted on the belief that he had a weapon. They did not hear her make such a statement. What's the reasonable basis of that belief, that there was shooting in the house? There was shooting in the house. There were shots being fired while they were en route. They did not have an opportunity to search the suspect. They had very little time. Did any of the officers say that there was a gun in either of his hands? None of the officers testified that they saw a weapon in the case and court said it is not necessary for an officer to see a weapon in order to believe. Counsel, you're down to about three minutes. You may want to reserve. You may do so. We'll hear from the appellees. Thank you. To please the Court, my name is John Scott, and I represent the wife and the daughter of the decedent. I'm here with Mr. Niesenbaum, who represents the mother. And if there are some questions that the Court would like to address to their claims, he's available for that. I would like to just follow up on the issues we've been discussing. And I'd like to point out, Your Honor, that there is a dispute among the police officers of what impact the SAGE had on Mr. DeSantis as he was either running or walking or jogging from the time he got up from a kneeling position to the time the shot from the rifle was fired. And that is specifically referred to at page 8 of our brief. And I would point out that Sergeant Soares, and he's the officer who fired the SAGE weapon, his testimony is at ER 471. He testified that when he fired the first SAGE shot, he observed Mr. DeSantis slow down, that the shot slowed him, and he looked down toward Mr. DeSantis looked down towards his hands and the left side of his body. So in my opinion, this is rather significant. It's for a couple reasons. Not only did he slow and look down at his body, but it's evident that he's wounded. So now we have somebody who's been shot and wounded who is perceived. Your relation of the facts seems to indicate that Mr. DeSantis was running until he was hit. He didn't start running when he was hit. He may have, you know, maybe he was. According to some of the officers, he was. However, the point I'm trying to make is even if you want to discount what Mrs. DeSantis is saying, hypothetically, what do the officers say? The officers say when he's hit by the SAGE, he is hit, he's obviously hit, he's wounded, and he's slowed down. This is before the rifle is fired. Okay? And Officer Mann testified that she heard a thud from the SAGE being shot, and it slowed Mr. DeSantis' pace. So the point I'm simply trying to make here ---- But he didn't stop, though. That was the point that the officers made, that he still kept coming. And this all happened in a short period of time. Well, and even Mrs. DeSantis says after he was shot, he was still, you know, stumbling, walking in that direction. The point being is that as this Court has observed, what threat did this unarmed man have to six officers who have canines, batons, tasers? They're trained in hand-to-hand combat. I mean, if you look at all the options these six officers had, even if he hadn't been hit by the SAGE, but now he's hit by the SAGE and he's been wounded. So he's less of a threat, whether he's running, stumbling. However, what we do have, if you're drawing inferences in our favor, yes, he's not running. But from my point of view, the point I'm trying to make is Sergeant Soares testified he was getting ---- Yes, they had other options. Yes, if he hadn't fired the second SAGE round between the dog and six officers, could they handle this guy? Of course they could, without having to kill him. Was it unreasonable for the officers to presume that he had a weapon? Let me answer that in two ways. It was reasonable for them to believe he might be armed until they saw him for two minutes. Once he came out of the house, not only does Mrs. DeSantis tell them that the gun is inside, not only that, they observe him in clear light for two minutes. What do they observe? They never observe a weapon, anything resembling a weapon, in his waistband, and they clearly observe his hands the entire time, and they never see a weapon in his hands. The point being, if he had made a ---- if he had something in his hand that resembled a gun, if he made a gesture, which there's no evidence he did, like a furtive gesture, maybe somebody could say, oh, geez, I thought maybe he was reaching for a gun because he might have a gun. A furtive move. A furtive move. In this, there's no record here. They never saw a gun. They never saw anything resembling a gun. They always saw his hands. They never saw a furtive move. So if you put all that together, yes, could an officer arriving at the scene think that, gee, this guy might still be armed? Of course he could. But anybody could still be armed. And just because somebody could be armed doesn't mean you shoot them and kill them unless you see a gun or a furtive gesture. Now, this is not a split-second decision. This is two minutes. Yes, there are cases out there, and I'm very aware of them. But there are other facts in the picture, are there not?  He was told ---- Yes. And all of that, which indicated that he had no intention of doing what the police were telling him to do. Well, he was complying, and then he wasn't complying. Let me ask you another question. You heard counsel's argument with respect to Graham v. Conner. What is the standard review from our standpoint? Here we have a denial of qualified immunity on a motion for summary judge and cross motions. How do we review this, particularly with respect to counsel's argument that you have to look at it from the standpoint, among other things, from the standpoint of the officer? Well, it's objectively from the standpoint of the officer, not subjectively drawing inferences in our favor. And that's what Graham is all about. It's an objective test. It's not the subjective, what the officer says. It's based on the totality of the circumstances. What would a reasonable officer objectively believe and perceive? It's an objective test. So, yes, the Court can say, what would a reasonable officer do in these circumstances? But it has to be from objectively, from the totality of the circumstances. The test is not from the point of view of an unreasonable, the subjective mind of an unreasonable police officer. That's not what the Fourth or the Fourteenth Amendment test. Under Porter v. Osborne, under the Fourteenth Amendment analysis, it's still in qualified immunity. It's the objective reasonable in the standard. I mean, otherwise, every shooting would be a good shooting. All the officer had to do was say, well, geez, I thought this and I thought that. And whether it was reasonable or not, he'd get a pass, because you'd say all he has to do is say whatever, you know, come up with anything, and it would be a subjective test, and every shooting would be a good shooting. So, yes, the Court is looking at it from a point of view, and a jury will look at it from a point of view, of given all of the facts, what would a reasonable officer have done? Well, let me throw these facts at you and just see what you think. Arguably, the officers acted reasonably in light of, one, the severity of the underlying firearm offense, the firing in the house, his manifest disregard for their authority when he refused to respond, the danger he posed to the officers by rushing directly at them, the failure of less lethal weapons to deter his progress, and the rapidity of the events requiring split-second decision-making. How many of those items should be taken into account, and how would you address those? Well, that is essentially the reason why our cross-motion for summary judgment wasn't granted, because that is basically looking at the facts to a certain extent, drawing inferences in favor of the police officer. However, you still get down to a basic premise of every deadly force case. Is there an immediate or an imminent threat of death or serious bodily harm? Not something that might happen, you know, might happen in five seconds or ten seconds. It's what is the immediate imminent threat now. Again, that has to be from the point of view of the officer, because you indicated earlier that if there were a move, even though he had no gun, the officer would be reasonable in at least assuming that there was a potential that he did have a gun and therefore respond. So, yeah, I would concede. If the officer said, I thought he had a gun, and he made a furtive movement or gesture towards, you know, some area of his person where he could have had a gun, would it be a different case? Yes. Would it still go down to the credibility of that officer, whether, in fact, he did see that furtive gesture because of five other officers there didn't see it, then we still have a credibility dispute over did he just make it up. But we've got six officers here. None of them saw a weapon. None of them ever saw a gun in his hand. And none of them saw a furtive gesture. But if hypothetically Sergeant Selle said, which he didn't, I saw a furtive gesture and that's why I shot him, we'd still have the credibility issue. Other five officers there didn't see it. Now, if the hypothetical is if all six officers said they saw a furtive gesture and that's why the shots were fired, that would be a different case. But that's not this case. Well, are you saying if there is a dispute of fact that both motions should have been denied? Well, that's what happened here. I mean, I didn't cross-appeal from Judge White's decision, although I thought about it, to come here and say that our motion for a summary judgment should have been granted. But, I mean, ultimately I spent a lot of time looking at Judge White's decision, which I thought was incredible in how much time he spent with his case and the merits. I mean, this is a very fact-specific analysis that he did here. So if we simply affirmed, it goes back for a trial on the merits, then, in terms of even on the immunity issue. Yes? Exactly. Did the parties seek to resolve this case short of trial?  Did the parties seek to resolve this case short of trial? Well, there haven't been any serious efforts in that regard to date, but. I was just thinking that this case looks like a really good candidate, and I'm just speaking for myself, for referral to our circuit mediation department. They're very good in terms of bringing parties together sometime. Would you be amenable to such a referral? Yes, of course, Your Honor. Actually, ironically enough, I'm seeing Mr. Sherwood there next week in a shooting case where I got a verdict in May before Judge Ilston under the 14th Amendment. And that case is going to be with Mr. Sherwood as a mediator next week. So, yes, I'm always willing to go to the Ninth Circuit mediation. Judge, it's nice to see you in Northern California. Thank you. I think that's it. Unless there's any other questions, I think that's all I have. I would just like to do two things I would direct the Court's attention to. In his decision, Judge White, at the bottom of the page, starting at page 10, the bottom of page 10, and through the top of page 11 of his decision, he points out ten factors where, in terms of the totality of the circumstances, ten factors, ten things the jury could look at that he believes would all infer, an inference could be made from them that qualified immunity shouldn't be granted here. And, you know, I won't bore you with reading them all to you, but I will. I don't have time. What page of the order are you referring to? Page 10. Page 10. The bottom of page 10 and the top of page 11. He focuses on ten factors that he considered here in drawing inferences in favor of the plaintiff, and above that, on page 10 above, I mean, there's only about three or four factors that he inferences that he was drawing to deny our motion for summary judgment. And I'd also ask the Court to look at, if you look at Porter v. Osborne, which is a controlling case under the Fourteenth Amendment standard, at the end of Porter, at pages 1141 and 1142, this Court, and it was Judge Fisher who wrote the decision, but on the panel was also Judge Toshima and Judge Nelson, they point to three factors there that they believe, if you drew inferences in favor of the plaintiff, would warrant not finding summary judgment and not giving qualified immunity in that case under a Fourteenth Amendment test. So I would just simply suggest to the Court, if you look at Porter v. Osborne and the three factors there that that Court looked to, and at least in remanding, saying that the district court should look at those factors in ruling on qualified immunity, and look at the ten factors that Judge White pointed to in this case, I don't think it's a close call that Judge White got it right. Kennedy. Counsel, if I'm not mistaken, either way we rule, the case still has to go back for the State law claims. Is that correct? Am I reading that correctly? I think that's pretty assured. Very well. Thank you. We will hear from Ms. Fowler. You still have some reserve time. Mr. Chairman, I'd like to focus on the second part of the qualified immunity argument, which is that it cannot be said from the record in this case that the officers clearly were on notice that their conduct was unconstitutional. There is no bright line that's been established to determine how close a potentially armed suspect must come to an officer before he or she can reasonably believe that their life is in danger, or that requires that an officer must engage in hand-to-hand combat with a suspect before resorting to deadly force. Qualified immunity protects officers both from mistakes of law, mistakes of fact, and mixed mistakes of law and fact. If the officers erred in this case in believing that Mr. DeSantis was armed, which we don't believe they did, but if the court were to have found that that was an error, this is precisely the type of case that qualified immunity was intended to apply to in circumstances such as this in rapidly evolving situations. Although the total incident was approximately two minutes, the time in which the officers had to react to Mr. DeSantis' sudden, unprovoked attack on them was substantially less than that. In talking about the other alternatives that were available... Counsel, what attack? When he charged at them, the officers all testified all six officers believed their lives or the lives of the other officers, depending on which position they were in, were in jeopardy, and Mrs. DeSantis herself testified she believed he was intending to headbutt the officers. Well, she was guessing that that might be. When she was pressed, she said, well, the only thing I can think of is maybe he was going to headbutt them. And she said that her husband's tendencies rather than flight would be to fight rather than to flight, that she did not perceive that he was trying to escape. With respect to the other alternatives, the officers all had their weapons drawn, pointed at Mr. DeSantis because they believed they were walking into a situation in which there was an active shooter. To require them, they would have had to have holstered their weapons, drawn out some other type of weapon, and hoped that they'd be able to get it before Mr. DeSantis reached them. There also already was a sage weapon drawn and shot and accurately shot. Right. And it was unsuccessful. They didn't have to holster that one and bring out another gun. So there was that. That's correct. But that was not a weapon that was available to the three officers that shot. I think that in looking at the alternatives, you must look at the alternatives for the individual officers who shot. Two of those officers did not have tasers on them, which the Court, again, found one of the alternatives that they should have considered. They certainly couldn't consider using an alternative that wasn't available to them. The three officers that shot also were not in charge of the canine officer. Again, that is a reasonable, not a reasonable alternative for them to have considered was not available to them. Did either of the officers who did do the shooting have a dog available? No. The canine officer was a different officer who is not a defendant in this case. The canine officer was located behind the officers that fired, and the canine officer testified that his concern in releasing the dog was that Mrs. DeSantis and her minor child were on the steps in close proximity to Mr. DeSantis. And additionally, the training is for canines that they would not release a canine when they believe the suspect is armed. Counsel, would the city be amenable to mediation of this case? No, Your Honor, we would not. We do not believe this is a case of liability. All right. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Rawlinson, Bea